to hear from you on the case of Reavis v. Frost. Good morning. Randall Wood for the Officer Blake Frost. And the first thing I want to say is that I certainly recognize that this is a tragic case. I don't want anyone to believe that our appeal here questions that in any way. This is obviously tragic for this gentleman and for the family. But this is a situation where, as this court has said many times, this is certainly a case where this court has said this is a tough task for the court. When the court is asked to draw lines on split-second decisions made by officers as to shoot or not shoot. And so because this is a denial of qualified immunity, I'm not going to repeat the briefs. I think they summarize the facts. But I do want to emphasize, though, that this was a buildup of facts and events that a situation suddenly turned into something very different and then became a shoot-or-don't-shoot decision in a matter of one second or even less than one second. So we know that these officers were out there investigating what they understood to be a very serious felony. A man had been stabbed in the arm. I don't know if you've seen the pictures in the record, but he literally has a seven or eight inch knife sticking out of a bicep. The officer's investigated, go to the hospital, time passes, and they have information that this person that they're a certain area, that he's going from one place to another. So they're searching this area in the middle of the night. And as our officer goes up this country road, he sees a black pickup truck, which is what he's looking for. The vehicle they're looking for, though, was pulling a trailer. Right, so. But by this time. This vehicle doesn't have a trailer. Correct. But by this time, many minutes had passed. This man who had been stabbed had gone into town. He'd gone to the hospital. He'd received treatment. The officers had come out, interviewed him, taken pictures, taken a report. Now they've gone down a different highway. They're working their way up to this area. The vehicle also supposedly has a very loud, extremely loud exhaust, right? True. No evidence that he observed that about this pickup. Basically, the only connection you have is a dark pickup, right? Dark pickup truck. We don't even know if it was an early 90s pickup, which was also in the description. We don't know if there was a child in the back. Yeah, he did not see and really didn't have the opportunity to inspect the inside of the truck. I presume he didn't think there was a child in the back because he shot through the back of the. Yes. Which makes me wonder if he ever thought this was the right vehicle to begin with. Well, he certainly thought that it could be. And so it was a series of events that are happening at this point where he's seeing suspicious multiple turns, multiple changes of direction to the point that he's going to stop this truck. And so he sees the truck go down the road. The truck sees the other officer coming up the road with lights on. He turns around and then stops directly in front of our officer who has his lights on. And then he steps out. And so he's going to stop this truck and investigate. And then at that point in time, things change very, very suddenly. But from the district court's findings, we have these factors of the suspicious activity not following commands, accelerating the truck towards the officer, moving within inches, evading the arrest, and the shots fired over a matter of a very short period of time. Well, what the district court, I think, found significant is that the shots weren't fired from in front of the vehicle with the vehicle coming at the officer. The vehicle had already passed the officer. And the shots went through the back window. So the focus of the district court was on whether the officer was in imminent danger at the moment he fired those shots. Isn't that the correct analysis? Well, it gets into the very fine point of when you say, well, the precise moment in time, how precise do you get? And if we look at the case law, my thought is, well, the case law kind of either points both ways or many different ways, or certainly to the extent that you can say where the situation is that an officer could be justified in shooting when the truck is coming at him, but then when he leaps out of the way, makes the decision to shoot. And by the way, all of this happens within 0.6 seconds or so. We can surmise that the truck is accelerating. So we're talking about the movement of an officer in a vehicle from the front of the vehicle to the side mirror, which is five feet. Would you agree that it's clearly established that if the officer has enough time to perceive that the threat has passed, that the officer cannot use deadly force? I would agree with that, but I would point to case law. So isn't that then a jury question of whether enough time had passed? Well, I think that the case law would say where it is. Something less than the amount of time necessary to perceive that the risk of harm had truly passed, then you can make an adjudication of the issue. And let me explain what I mean by that. Aren't you then challenging the district court's facts? I don't challenge the facts. Well, I think you are, because the district court said, here there was no immediate danger to other officers or civilians. And the only risk at the moment the gun was fired was that created by Mr. Cole fleeing from the stop. And yet you're suggesting that wasn't the only risk. And we don't have jurisdiction. If you're challenging those fact findings, we don't have jurisdiction. My view of it would be this, that the facts are, as the district court found, the movement of the truck. But I do think that it's appropriate for the court to then weigh the conclusion to be drawn from those facts. And I think in many cases, this court has, in fact, engaged in that analysis to say, OK, under these facts, was there truly a imminent threat of harm, such as to justify the use of force? But the district court said a reasonable jury could definitely find that there was no risk. So it's not up to us to re-weigh that. I think the courts, though, do look at that as it could be a legal issue where we are trying to decide, is this a sufficient time passed such that we can say that the cases would create an issue of fact or would open the door to a discussion? But I would say that, well, there's cases, though, that say that under similar situation where officers are, the car has passed, the officer is shooting in a rapidly evolving situation, and the court said, that's OK under these circumstances. They weren't saying we have to be bound by that conclusion drawn by the district court. They were evaluating the fact that we were in a situation. The cases you cited in your brief were not cases where the vehicle had passed. It was either coming at the officer. It certainly wasn't this situation. I would point the court to Thomas Durastanti. So that is a situation where Officer Frost could look at that case and say, well, yeah, that was a case where the Lincoln had passed. Now, we had a situation. Everything's a little different, I understand. Well, that one, the car actually hit the officer. He hit the officer. OK, the officer fired two shots. He's hit, rolls over the hood, comes back. Then he fires two more shots. After the car has passed. So there's things both ways there that the court could look at and Officer Frost could look at. But I think there was another number of comments there that the court was saying, if you're threatened by a weapon, which you can include a car or a vehicle, you can use deadly force. The closeness of the officer is a factor. The closeness of officers to the projected path of the vehicle authorizes the use of deadly force. The agent's use of deadly force two seconds after the first shots was still justified. And that's after the car has passed. It was a split second decision. They review that from the perspective of the officer, not the driver. And of course, in a lot of these cases, we have dissents going both ways. So this is a situation where I think to look at this very carefully. And sometimes they. But when the district court said a jury could conclude, that seemed to be the standard that it applied. Is that an appropriate standard? Well, I think on an appeal from a denial of qualified immunity, we can say is that, I'm not questioning the facts determined by the court. But I think the court can say, do these facts support the possible inference that there was an unreasonable use of force? Then deferring to our Graham factors and other factors. But if we kind of look at then the cases cited by the district court, I'm sorry I'm running out of time. But the court said, well, the decision that the court makes is justified by Fancher and by the Ronquillo case. And Ronquillo was decided after this event. But maybe it has some utility, because it's looking back at the case law. It's unpublished also. Unpublished, yes. But both of those cases were very different factually. Well, in Fancher, there was time to reflect. There was, correct. The assailant had been shot almost point blank and was stooped over. And the officer stepped away from the car and kept shooting. I mean, that's a different set of facts. And so that's something where somebody in the position of Officer Frost could say, well, it looks like a factor that the courts look at in judging propriety of the use of force is we've got a situation where that guy's out of the picture. He's been shot. He's incapacitated to the point that other witnesses say, he was incapacitated. And I heard shot, then more shots. And there was time to see that. And that's not our case. This is not our case. This precise moment in time measure that the district court uses, is that still good law? Well, it's good law. However, I think that the Supreme Court is telling us two things. Number one, be more precise, telling us all be more precise in our statement of what is the standard of law that we're trying to apply here. And I think in some of our past cases this has been a fairly broadly applied standard. And also, it's saying, let's avoid an excessively technical dissection. So to plead and advocate on behalf of the officer, I would say, he's put in a position where is he and other officers going to be told, if you are valid in shooting at the front of the car, but then dodge out of the way and shoot 0.6 seconds later, maybe you're wrong. And that puts him in a very difficult situation. So I'll reserve the balance of my time with the permission of the court. Thank you. Thank you, Your Honors. Andrew Casey on behalf of the appellee, JoCatherine Rivas for the estate of James Cole. Counsel's right. This is an undeniably tragic case. It's also an undeniably preventable case. And it's an undeniable case where an officer has been warned under decades of laws about how it is that we are firing weapons at suspects as they're driving and fleeing away from us. We apply the Graham factors. How do those apply here? The district court did a thorough analysis of the three Graham factors, obviously articulating that the second factor, immediacy of harm, happens to take a much higher prevalence on these set of facts. Here, the district court announced whether or not there was an active commission of a crime. And I need to distinguish this moment of the facts from the idea that what Officer Frost is looking for is a violent stabbing suspect. The record is very clear from Officer Frost's deposition that at the time that he got out of his patrol truck, he did not know that the suspect was the stabber. And he knew that the suspect, that the person he was pulling over, could just be an ordinary citizen. He did not know that that person that he had stopped for that traffic stop was a dangerous criminal. We didn't know whether he wasn't either, right? Isn't that always the case? He believes, or apparently believed, that this was the same. They had the right guy. Yeah, and it's an interesting part, because we live in a time where there is a lot of fright about every time I pull somebody over, it might be the time when somebody pulls a gun. Well, isn't the question whether that was a reasonable belief on his part? And assuming it was, didn't he have a reasonable belief that he might have someone who had just stabbed someone, as well as who had just attempted to, apparently attempted to hit him with their vehicle? And that's why I think it's important for the rules to really discern who it is that we're here, and who it is that we're identifying. He doesn't know that at the time. He knows that it could literally be just any other person driving a Chevrolet on a back road down the road. Again, Judge Moritz has pointed out the key fact there. I mean, he doesn't know that he's not the guy they're looking for. And we do have a severe crime, and that's the measure under Graham. I mean, this follows a lot of cases we've had where they are looking, police are looking for someone following a violent crime, and we have that here. I would encourage this court to pay attention to the point of view that the officer testified about, which in the records, whether it's at 429, 490, 190. You see, I said he didn't know. Exactly, and he made it very clear that he could be entirely mistaken at that time. Of course. And I think that is important because it then jettisoned whether or not he was making an arrest at that time, and I think that. He wasn't making an arrest, he was investigating. Exactly. Which he was totally, it's totally appropriate. He was doing a traffic stop at that moment. And the problem with that next step that then he took is what is it that you actually have that you can confirm? You can't assume from a reasonable officer's perspective that literally everyone might be a violent criminal trying to assault you. You have to judge it by the facts that are there, and at that moment, all that we have in the light most favorable even to the moving party is that there's a misdemeanor of evasion being committed. That's what he saw. That's what he saw, yeah. And the case law doesn't require that he just go by what he observed, it's by what he reasonably suspects. And so, and the district court found that against you, so make your best argument that even with that factor being against you, you still come out on top on the gram factors. Well, I mean, the best argument, and it's no secret, is that the second prong of the gram factors prevails in a situation like this, especially when the immediacy of harm has passed and has abated. At this situation, the officer has had time to get out of the way, and he has moved out of the path of danger. He then pulls up his weapon, and he aims it at the back of the vehicle. And the pictures can speak 1,000 words about this. If you look at page 538 of the record, 540, and you go back and you look at the scale of what it's showing you, the OSBI investigation is showing gunshots into the back of a windshield. And it doesn't show into the side of a car. It doesn't show that it's being- Back of the windshield or the back glass in the pickup? I'm sorry, Your Honor. The back glass of the pickup. Although, interestingly, the trajectory of the bullets do hit at the front of the windshield as well, which also helps identify that when he's shooting, he's behind this truck. I mean, we have a very, as counsel's pointed out, your opposition has pointed out, we have a very fast-moving development of facts here, don't we? The truck is moving. The officer's moving. He doesn't know who he's dealing with. The truck is coming at him. What's he supposed to do? Not shoot, Your Honor. And I disagree. Never shoot, OK. I disagree plainly with two things said by counsel. Number one is I think counsel is trying to impress upon the court the idea that this is happening over 0.6 milliseconds. I think that's an exaggeration. What we have is a car that has passed, and an officer has raised the gun and started firing into the back of the weapon. Do we know which shot killed him? Because I think this trajectory you're speaking of, it shows, and I'm looking at it, it shows at least one shot going through the side, the rear part of the passenger side. And then it shows four other shots going through the back window. I don't know if this picture- Do we know which shot killed him? I don't know if this picture is in the record for the appeal, but it was certainly there for the district court judgment. There's a picture where the officer takes a pencil and shows it through that one that kind of looks like it's angled off to the side. And that points in a direction not at the driver. All the bullets into the back windshield are very clearly coming at the driver. But it was all firing that was instantaneous, one after the other, right? Yeah, I believe that all seven or so shots were filed. And so the first firing is occurring, we think, when the side mirror is approximately where the officer is? I disagree with that conclusion. What do you think the first, when? I think that the cab of the pickup is clearly past the officer before there's anything that's happening. And I'll be very blunt about this. If you look at the record on about 540 as well, you have another picture that shows scattering of the actual bullet placements.  from the front area of the officer's pickup. And then another four off to the side. So it looks like he took four shots from in front of his pickup and moved around to the left side for a different vantage point. Because there's just two clusters of bullet casings in different areas. I think that shows you quite a bit about where this is. And I think it also contradicts the conclusion by Officer Frost that he's pinned in between two vehicles and firing shots. And I think that's important. I read this case, it was very recently decided. It's a February 26 decision. Judge McHugh, I think that you were a part of this decision. And it goes into a thing that I want to be remembered for determining jury questions, which is that this court should be cautious in second guessing a motion for summary judgment on qualified immunity grounds to ensure that a defendant officer is not taking advantage of the fact that the witness most likely to contradict his story, the person shot dead, is unable to testify. That's a state of smart versus city of Wichita. I mean, in this case, we don't have body cam, which was available to the officer. We don't have videos to show you what's happening. We have one officer's testimony, and begging your pardon, but there's so much evidence about these shots that don't add up to a I have a car that is threatening me that I'm actively firing. We also have an officer with a history of dishonesty. What's the clearly established law that we should rely on? I think that there's precedent that sets over several decisions leading up even to the 2009 Cordova decision about shooting and not shooting, about the immediacy of harm of a vehicle coming at you. It almost seems simple to say this, but every case is there on it. You have cases spread throughout the record of officers having cars coming at them when shots are being fired, and the court's ruling. These are- Those cases are- Yeah, what do you rely on? What clearly established case law? We cited Cordova versus Aragon, which I think is a very- Cordova? What's that? What did you say? Cordova versus Aragon. And I think that does, it's a lengthy opinion. I think it really goes into depth about the timing because it even breaks up and says, there are moments and shots happening at a time with a car coming at you, which is okay, but after it has passed and abated, no longer do we have something that is, you know, a justification or a reasonable Fourth Amendment seizure. And when was that ruling issued? It's a 2009 case. It was seven years before this shooting in this case. And the language of Cordova, I mean, it's very powerful language, and it fit its way into a fusty county policy very clearly. And the facts of it, and this is something I really want the court to take hold of. The facts of Cordova are so much worse than this case. The facts in Cordova include a driver who is driving recklessly. He's running red lights. He's trying to ram police cars. He's on the wrong side of the highway. Here, the district court rules, and even this officer admits, there's nobody on this dirt road in front of this gentleman as he's driving away. And that's a Tenth Circuit case, right? That's a Tenth Circuit case, Your Honor. And we've had Supreme Court cases issued after that. And we have sensed, and perhaps you have too, that the granting of qualified immunity is something that we should do more of, not less of. And that we have been too stringent in our application to find unreasonable force and split-second decisions by officers. Mullinex is a case that we are repeatedly cited to by the Supreme Court. So I'd like to talk about Mullinex for a second, because I feel that fear, so to speak, or that direction coming from the Supreme Court. And I think that this is something that is a dramatically different case than what we're dealing with here. In Mullinex, you have a suspect who has called dispatchers, threatening to hurt officers. He is driving at extremely high rates of speed. He is, he's got weapons on him. He's got a warrant for a felony arrest. Everything tells the officers, this is absolutely a dangerous person. There's no mistake of fact. There's no question about what is there. And the officers are gearing up for spike strips, and an officer who is ahead, and can see that there's a person driving erratically, wanting to hurt officers, could hit the person manning the spike strips, and he fires about six shots down into the vehicle as it's coming at him and the other officer. The court there- He's up on a bridge, isn't he? He's up on a bridge, right. He's at a- The vehicle isn't coming at him. The vehicle's coming at the person manning the spike strips. And that's where the court, and this is the disagreement between Judge Sotomayor and Judge Scalia and Roberts, I believe wrote the concurrences in the main opinion there, is that Sotomayor had focused a lot on the training of the officer that they'd been told not to do X, Y, or Z, which are different than the case law perspectives that we have here. And at the time, they said, hey, we don't have a rule about whenever there's somebody in front, whenever there's a threat coming at somebody and you're ahead of it and can try to stop it, that you have to use spike strips first. That's something that I think they're rebuking in a decision like that. Here, I don't think that we overreact to the Mullinex decision by trying to stringently recraft all those histories of cases going back to Graham. We can realize through the several cases leading up to Mullinex that there's still a very strong rule out of those Graham factors. We don't fire into people fleeing away unless we know that there's an immediate threat in front of them, or at least a substantial threat in front of them. And it's not a question of hoping for the best as James Cole leaves that part of the area, because the language that is being decided in all of those cases is talking about driving into another officer, driving into another officer's vehicle, into a highly populated area. Here, this is country roads in the middle of the night. Nobody in the world is out there. And the threat has passed the officer when the officer is fired. Yeah, that's the key question, whether the threat has passed. And the only people- And whether in your pleadings you've established that it's clearly established law that this officer should have known not to shoot. And respectfully, the only entity that can answer that question is a jury of peers. And that's something that I think- Well, not clearly established. Well, not the clearly established question. I'm talking about the facts of, is he in danger at that moment? And that's something that has to be left  It's something that we can't second guess on the district court- Well, again, the clearly established law requirement is looking at what the officer should have known and how he should have measured his conduct in that situation. And I think that this circuit has taught officers effectively that you are in immediate harm with a vehicle coming at you, and that there are others in immediate harm when a vehicle's coming at them, and that justifies a deadly force. But for the use of that most deadly force in the operation of a seizure, once a threat is subsided, we have protections under the Fourth Amendment for our citizens to prevent tragic situations like this where they get the wrong person and they kill somebody who didn't need to be killed. Thank you. And frankly, your honors, I'll close by referring to that. It is a situation where I think even if you looked at the qualified immunity analysis, if you look at the line of cases, even going back to Cordova, this is a situation that's not close to as bad as the Cordova decision was. If this develops, if James Cole is driving erratically and there's more people- You're out of time, the clock goes up. Oh, your honors, I didn't even see that it was red. I'm so sorry, I just saw the 1.30. Thank you so much for your time. Thank you. Could you add time? I have just a couple of minutes. I just wanted to emphasize a couple of points. First of all, I think Judge Schroeder did take into account and was mindful of the fact that Mr. Cole was not there to testify. So I think the judge was cautious of that and was careful about crafting the findings of fact. But I want to clarify one point, and I think the court has hit on this, is that Officer Frost did not know the person they were looking for. So when he saw this person in the truck, he did not know whether this was or was not the person they were looking for. But also from his perspective, and I think it needs to be evaluated from his perspective, he was investigating a violent crime, not just somebody that was going to commit a misdemeanor of evading a stop. It was something much more than that to him, potentially. The Cordova case was a case where the court actually granted qualified immunity to the officer because when you get into this line drawing area, it's difficult, and they were evaluating and very focused on the particular facts of this case. Well, in the Cordova case, the victim lived. I say the victim, the individual who was shot lived, and he said that the officer fired at him, and I think, maybe I'm getting this wrong. No, I'm sorry, he was fatally wounded, I apologize. It is similar in that respect, but the difference is I think that there was a theft suspected, or some suspicious driving, which is not what our situation is here, I guess. And I want to also emphasize that Cordova was followed the very next year by Thomas versus Durasanti. So it's a range of cases that the court needs to consider. So I thank you for your time. Thank you. Thank you, counsel. Thank you both for your arguments this morning. Case is submitted. Our last case for argument this morning is.